# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| CLAUDIO HERNANDEZ, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> J. STERLING MORTON HIGH ) <br> SCHOOL, DISTRICT 201; MICHAEL ) <br> KUZNIEWSKI, in his individual ) <br> capacity; JAMES ZUNDELL, in his ) <br> individual capacity; and JOSEPH ) <br> KEATING, in his individual capacity; ) <br> ) <br> Defendants. ) | No. 18-CV-01501 <br><br> Judge John J. Tharp, Jr. |

## MEMORANDUM OPINION AND ORDER

Plaintiff Claudio Hernandez brings his Amended Complaint pursuant to 42 U.S.C. §§ 1981 and 1983, alleging that the defendants, J. Sterling Morton High School, District 201 ("District 201") and three employees of the District—Michael Kuzniewski, James Zundell, and Joseph Keating ("the employee defendants")—engaged in unlawful national origin discrimination and unlawful retaliation leading to his wrongful termination. The defendants have filed two separate motions to dismiss the first amended complaint in its entirety. For the reasons set forth below, District 201's motion to dismiss is granted without prejudice and the employee defendants' motion to dismiss is denied.

## BACKGROUND

In considering the motion to dismiss, the Court accepts the well-pleaded facts in Hernandez's first amended complaint as true and draws all permissible inferences in favor of the plaintiff. *Agnew v. NCAA*, 683 F.3d 328, 334 (7th Cir. 2012).

Claudio Hernandez began his employment relationship with District 201 in 2000 when he accepted a position as a maintenance worker in the custodial department. Am. Compl. ¶ 15, ECF No. 18. In 2008, Hernandez applied for a position as one of District 201's four boiler firemen. *Id.* ¶ 15. After District 201 filled the position with a white candidate who was "not qualified," Hernandez filed a charge of employment discrimination with the Equal Employment Opportunity Commission ("EEOC") in March 2008. *Id.* ¶¶ 21-22. Roughly four months later, District 201 reached a financial settlement with Hernandez in the EEOC case, fired the recently hired fireman, and offered the position to Hernandez. *Id.* ¶ 23. Shortly thereafter, in July or August 2008, Hernandez accepted the offer, which came with a higher salary and more generous benefits. *Id.* ¶ 24, 27. Hernandez's transition to the new position was not smooth,[1] however, and the circumstances underlying Hernandez's complaint stem from his time as a fireman for District 201. *See id.* ¶ 25-26.

During his tenure, Hernandez's District 201 co-workers and supervisors subjected him to a litany of insults and discriminatory behaviors. Hernandez provides a list of frequent remarks, including, "Go back to Mexico," "Go to ESL," "You're a fucking chopper." *Id.* ¶ 30. Further, Hernandez's fellow employees repeatedly and inaccurately accused him of stealing items that went missing. *Id.* ¶ 36. Hernandez's co-workers often told Hernandez that he was being watched by school security cameras, as well as by his supervisors, defendant Kuzniewski, District 201's superintendent hired in 2010, and defendant Zundell, Head of the Custodial Department. *Id.* ¶¶ 34, 50. As Hernandez describes it, these threats were not without basis: on multiple occasions, Zundell

---

[1] Hernandez's complaint recounts a meeting to discuss the transition at which District 201's Principal, Hector Garcia, questioned Hernandez's ability to perform the duties required of the firemen. Am. Compl. ¶ 25, ECF No. 18.

radioed Hernandez, requesting that he state his location, saying, "I can't see you on the security cameras." *Id.* ¶ 49. Several times, Kuzniewski and Zundell explicitly told Hernandez that they were watching him. *Id.* ¶ 48. Hernandez never witnessed this behavior exhibited towards other employees. *See id.* ¶ 51.

In October or November 2014, Zundell called Hernandez on Sunday evening and asked him to complete an emergency repair of one of the school's boilers. *Id.* ¶ 37.[2] After arriving at school, Hernandez parked in a spot reserved for the principal because it was "close to the school building" and Hernandez did not expect any other visitors on Sunday evening. *Id.* ¶ 39. Later that evening, Kuzniewski arrived and proceeded to yell at Hernandez regarding his choice of parking spot, "Can't you read the fucking sign? Of course you can't read, you fucking Spic." *Id.* ¶ 43. Kuzniewski continued, calling Hernandez "a fucking Mexican" and warned him to "read his contract" before laughing and saying, "Oh, you can't read it, you Spic." *Id.* ¶¶ 44-45.

Around midnight on Saturday, October 17, 2015, Zundell once again called Hernandez, instructing him to attend to an emergency at school. *Id.* ¶ 54. After working for a few hours, Hernandez fixed the problem, but encountered a new one of his own: his truck would not start. *Id.* ¶¶ 55–56. Hernandez had keys to the school vans and, given the late hour and the fact his next shift started early in the morning, he decided to use one to get home. *Id.* ¶ 57. According to Hernandez, this was common practice: the other firemen often used the school vans for non-school purposes. *Id.* ¶ 60. The following Monday, October 19, Zundell asked Hernandez if he had used the van to drive home and Hernandez stated that he had and explained the situation. *Id.* ¶¶ 58-59.

---

[2] Hernandez saw this as part of a larger pattern in which "District 201 most frequently called [ ] Hernandez to handle emergencies, even when he was not otherwise scheduled to work." Am. Compl. ¶ 29, ECF No. 18.

Several weeks later, on November 10, 2015 at around 9:00 p.m., a fellow employee delivered Hernandez a "notice of investigatory meeting" from defendant Keating, District 201's direct of Human Resources. *Id.* ¶ 61. The meeting, scheduled for the next day, would deal with two incidents under investigation. *Id.* ¶ 64. First, between October 15 and October 17, Hernandez was "observed, on multiple occasions and without authorization, removing items from the East Campus building and placing them in [his] personal vehicle as well as a District vehicle." *Id.* ¶ 62. Second, during the same period, Hernandez was "observed leaving the East Campus in a District vehicle without authorization and did not return for several hours." *Id.* ¶ 63.

Hernandez reached out to his union representative, Robert Szudarski, and together they attended the meeting with Keating, Kuzniewski, and Zundell. *Id.* ¶¶ 65, 67. At the meeting, Keating and Kuzniewski accused Hernandez of stealing school property and urged him to confess, telling him they had already contacted the police. *Id.* ¶¶ 68-69. Next, they showed Hernandez a video recording of him carrying brown packing boxes to his truck. *Id.* ¶¶ 71-72. Hernandez explained that the boxes had been emptied and deposited in the trash—he was taking them home to reuse them, a common employee practice. *Id.* ¶ 73.

On November 23, 2015, Hernandez received a second letter requiring him to attend a meeting the following day on the results of the investigatory meeting. *Id.* ¶ 76. Hernandez and Szudarski, along with defendants Kuzniewski and Keating, attended the meeting on November 24. *Id.* ¶ 77. Keating commenced the meeting by presenting Hernandez with a resignation letter and asking him to sign it. *Id.* ¶ 78. Hernandez refused, and Keating presented him with a second letter, a "Notification of Placement on Unpaid Suspension," which indicated the action represented the recommendation of Kuzniewski. *Id.* ¶¶ 79-80. The letter stated that "[o]n December 9, 2015, a recommendation to terminate your employment with J. Sterling Morton High School District 201

4

will be presented to the Board of Education. You will be notified of the Board's decision." *Id.* ¶ 82. Hernandez was not advised that he could attend the Board's meeting and was not contacted by anyone on the Board. *Id.* ¶¶ 86, 88.

On December 10, 2015, Keating sent Hernandez a letter terminating his employment. *Id.* ¶ 89. District 201 filled the empty fireman position with Mark Zaboynik, Keating's brother-in-law, who had previously been working for District 201 as a plumber. *Id.* ¶¶ 52, 96. Following his termination, Hernandez applied and interviewed for a fireman position at Naperville Community Unit School District 203 ("Naperville District 203"). *Id.* ¶¶ 97-98. In response to a reference request, District 201 informed Naperville District 203 that Hernandez had been fired for stealing. *Id.* ¶ 99. Hernandez was not offered the Naperville District 203 job and has been unable to find work as a fireman since his termination. *Id.* ¶¶ 100-01.

Hernandez filed suit against District 201 on February 28, 2018 alleging claims under 42 U.S.C. § 1981. Compl., ECF No. 1. Three months later, with the Court's leave, Hernandez filed the first amended complaint, adding the employee defendants, Kuzniewski, Zundell, and Keating, and requesting relief under 42 U.S.C. § 1983. Am. Compl., ECF No. 18. District 201 and the employee defendants filed separate motions to dismiss. *See* Defendant, J. Sterling Morton High School District 201's Memorandum in Support of Motion to Dismiss Plaintiff's First Amended Complaint, ECF No. 21; Defendants, Michael Kuzniewwski, James Zundell, and Joseph Keating's, Memorandum in Support of Motion to Dismiss Plaintiff's First Amended Complaint, ECF No. 32.

## DISCUSSION

To survive a motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted, a complaint must "contain sufficient factual matter, accepted as true, to 'state

5

a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible if the plaintiff has pleaded "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A plaintiff does not need "detailed factual allegations," but must plead more than "labels and conclusions" and "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. Determining whether a complaint plausibly states a claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

In the discrimination context, a complaint states a plausible claim if it identifies the "who, what, and when" of the discrimination. *See Huri v. Office of the Chief Judge of the Circuit Court of Cook Cty.*, 804 F.3d 826, 833 (7th Cir. 2015) ("A complaint that identified 'the type of discrimination' the plaintiff thought occurred, 'by whom, ... and when' was 'all [the plaintiff] needed to put in her complaint.'" (quoting *Swanson v. Citibank, N.A.*, 614 F.3d 400, 405 (7th Cir. 2010)). When well-pleaded, these facts provide "a reasonable expectation that discovery will reveal evidence supporting the allegations." *Id.*

### I. Plaintiff's Claims are Timely

In their respective motions, District 201 and the employee defendants moved to dismiss Herndandez's claims as time barred. Although parties need not "anticipate and overcome" affirmative defenses in their complaints, they can plead facts that make it appropriate to consider such defenses at this preliminary stage. *Cancer Found., Inc. v. Cerberus Capital Mgmt., LP*, 559 F.3d 671, 674 (7th Cir. 2009). As relevant here, "[w]hile the statute of limitations defense is not normally part of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), when the allegations of the complaint reveal that relief is barred by the applicable statute of limitations, the

6

complaint is subject to dismissal for failure to state a claim." *Logan v. Wilkins*, 644 F.3d 577, 582-83 (7th Cir.2011). In the present case, Hernandez's complaint plainly describes the timeline of events relevant to his wrongful termination claims and it is proper to assess the timeliness of those claims.

Timeliness is a function of the accrual date of the cause of action and the length of the relevant statute of limitations. A § 1983 claim accrues "when the plaintiff knows or should know that his or her constitutional rights have been violated." *Kelly v. City of Chicago*, 4 F.3d 509, 511 (7th Cir. 1993). More specifically, Hernandez's wrongful termination claims accrued when he was informed of that termination on December 10, 2015. *See Draper v. Martin*, 664 F.3d 1110, 1113 (7th Cir. 2011) (quoting *Flannery v. Recording Indus. Ass'n of Am.*, 354 F.3d 632, 637 (7th Cir.2004)) ("[T]he date of the unlawful employment practice is when a 'final, ultimate, [and] non-tentative' decision was made for which the employee receives unequivocal notice.").

The timeliness dispute in this case concerns the relevant statute of limitations. Hernandez argues that the statute of limitations is four years, making his February 28, 2018 complaint timely. District 201 and the employee defendants maintain that the statute of limitations is two years, which would render Hernandez's claims time barred. The source of their conflicting views is a disagreement over the applicability of 28 U.S.C. § 1658. Enacted in 1990, § 1658 creates a four-year statute of limitations for civil actions "arising under an act of Congress enacted after the date of the enactment of this section."

Prior to the enactment of § 1658, Hernandez's suit would have been unequivocally time barred. Although asserting a § 1981 right, Hernandez's claim for relief arises under § 1983 and, prior to 1990, the Supreme Court held repeatedly that ***all*** claims arising under § 1983 borrow the relevant state's personal injury statute of limitations. *See Wilson v. Garcia*, 471 U.S. 261 (1985)

7

(holding that courts should "select, in each State, the one most appropriate statute of limitations for *all* § 1983 claims") (emphasis added); *see also Owens v. Okure*, 488 U.S. 235, 240-41 (1989) ("[A] State's personal injury statute of limitations should be applied to all § 1983 claims."); *Woods v. Illinois Dep't of Children & Family Servs.*, 710 F.3d 762, 765 (7th Cir. 2013) ("[C]ourts should apply the state limitations period governing personal injury claims to all § 1983 claims."). Under Illinois' two-year statute of limitations for personal injury suits, Hernandez's limitations period would have expired prior to his 2018 filing.

Hernandez, however, maintains that these holdings no longer apply after the passage of § 1658. Evaluating that argument requires interpreting the scope of § 1658, which hinges upon the statute's "arising under" clause. What does it mean for a claim to arise under a post-1990 enactment? In *Jones v. R.R. Donnelley & Sons Co.*, the Supreme Court interpreted the clause in the context of the post-§ 1658 legislative expansion of § 1981. 541 U.S. 369 (2004). In 1991, Congress amended 42 U.S.C. § 1981 to permit claims—like Hernandez's—alleging racial discrimination after the formation of a contract. *See Campbell v. Forest Pres. Dist. of Cook Cty., Ill.*, 752 F.3d 665, 670-71 (7th Cir. 2014). In *Donnelley*, the Supreme Court held that those newly created post-formation racial discrimination claims "arose under" a post-1990 enactment (even if they attached to a pre-1990 statute) because they were "made possible by" the 1991 amendment to § 1981. 541 U.S. at 382-83.

The present case presents a different question than the one directly at issue in *Donnelley*, but *Donnelley*'s "made possible by" standard yields the same result: § 1658's statute of limitations applies to Hernandez's claims. Post-formation discrimination claims against private employers— like those in *Donnelley*—are asserted directly through § 1981, 541 U.S. at 371, whereas claims against state actors—like Hernandez's—run through § 1983's (pre-1990) remedial scheme. *See*

8

*Campbell*, 752 F.3d at 671 (holding that "§ 1983 remains the exclusive remedy for violations of § 1981 committed by state actors"). Just as in *Donnelley*, however, the claims at issue here would not have been possible prior to the 1991 amendment to § 1981: Hernandez's claims allege the violation of a right to be free from post-formation employment discrimination that could not have occurred prior to 1990 because the underlying right did not exist. Although the claim is asserted through § 1983 and no part of § 1983 was enacted after 1990, the claim was still "made possible" by the post-1990 enactment because that enactment created the underlying right. Absent an underlying right or duty, no violation, and therefore no claim, was possible.[3]

This Court has previously grappled with § 1658's application to post-formation discrimination claims (*i.e.*, claims that were made possible only by the 1991 amendment to § 1981), recognizing that *Donnelley*'s logic suggests that § 1658 should be applied to such claims but concluding that *Wilson* and *Woods* require the continued application of the two-year Illinois' limitations period until such time as the Supreme Court and the Seventh Circuit hold otherwise. *See Nitch v. Ester*, No. 16-CV-6033, 2017 WL 4630878, *7 (Oct. 17, 2017). On further reflection,

---

[3] Although neither the Seventh Circuit nor the Supreme Court has decided this issue, other courts considering the question have, with near unanimity, reached the same result. First, based on this Court's review (the parties' briefs stay within this circuit), only one appellate court—the 11th Circuit—has weighed in, holding that § 1658 applied. *Baker v. Birmingham Bd. of Educ.*, 531 F.3d 1336, 1338 (11th Cir. 2008) ("Were it not for the 1991 Act, Baker's complaint would fail to state a claim under § 1983."). Second, in-district courts have generally reached this conclusion. *See Sams v. City of Chicago*, No. 13 C 7625, 2018 WL 4679581, at *5 (N.D. Ill. Sept. 28, 2018) (collecting cases). Finally, the Seventh Circuit indicated openness to this position, albeit in dicta. *See Campbell*, 752 F.3d at 668 ("Of course, even if § 1983 provides the exclusive remedy, [plaintiff's] claim is still based on a violation of § 1981 that could not have occurred before the Civil Rights Act of 1991 amended that statute. Thus, one might argue that § 1658's four-year statute of limitations should apply regardless. However, Campbell has disavowed any reliance on § 1983; therefore, we express no opinion on that issue, and we turn to whether he may proceed directly under § 1981.").

9

however, the Court concludes that applying § 1658's four-year limitations period does not require finding that the Supreme Court overruled—or will overrule—its previous holdings on the statute of limitations for § 1983 claims. Those cases directed courts to apply state statutes of limitations as a gap-filling measure, not as matter of first principles: 42 U.S.C. § 1988, which governs proceedings in vindication of civil rights (like § 1983 claims), instructs courts to look first "to the laws of the United States 'so far as such laws are suitable to carry [the civil and criminal civil rights statutes] into effect.'" *Burnett v. Grattan*, 468 U.S. 42, 47-48 (1984). Only once the "principles of federal law are exhausted," are courts to "resort to state law." *Wilson*, 471 U.S. at 268. Even then courts are to apply state law "only if it is not 'inconsistent with the Constitution and laws of the United States.'" *Burnett*, 468 U.S. at 48. In other words, the Supreme Court's instruction to borrow was conditional: only absent a federal statute specifying the applicable statute of limitations will § 1983 claims borrow a statute of limitations from state law. By providing a statute of limitations that applies to certain § 1983 claims, § 1658 shrunk the "void" in federal law where that condition was met. *Board of Regents v. Tomanio*, 446 U.S. 478, 483 (1980). In the new framework, the threshold question is the applicability § 1658: if the cause of action was "made possible by" a post-1990 enactment, it uses § 1658's statute of limitations and gap-filling is not implicated.

In *City of Rancho Palos Verdes, Cal. v. Abrams*, the Supreme Court employed the post-§ 1658 framework. 544 U.S. 113 (2005). The issue in *Abrams* was whether an individual could enforce rights created by the 1996 amendment to the Communications Act of 1935 through a § 1983 claim. *See id.* at 120-121. The statute of limitations for such a claim was relevant to that question, and respondent argued that a § 1983 claim would borrow the Communication Act's limitations period. In addressing the issue under both § 1658 and *Wilson*, both the respondent and

the Court recognized that the threshold question in such an analysis was whether § 1658 applied to the claim. *See id.* at 124-125. The Court, however, did not need to answer the threshold question because it concluded that, in either case, the Communication Act's statute of limitations would not apply. *See id.* Nonetheless, in dicta, the Court noted that, due to the post-1990 enactment of the relevant portion of the Communication Act, § 1658's four-year statute of limitations "would seem to apply" to a hypothetical § 1983 claim. *Id.* at 124 n.5.[4]

In the present case, Hernandez's claims arise out of a post-1990 enactment, which means that the statute of limitations is four years and his claims are timely.

## II. Factual and Legal Sufficiency of the Complaint

District 201 and the employee defendants have also moved to dismiss Hernandez's Amended Complaint on grounds that it pleads either inadequate facts or improper legal theories to support a plausible claim for relief.

---

[4] Although it may appear at odds, the *Abrams* Court's reaffirmation of *Wilson* does not conflict with a framework in which § 1658 and *Wilson* function in parallel. *See id.* at 124 ("[Respondent] argues that the rule . . . that § 1983 claims are governed by the state-law statute of limitations for personal-injury torts, does not apply to § 1983 actions to enforce statutes that themselves contain a statute of limitations . . . This contention cannot be reconciled with our decision in Wilson, which expressly rejected the proposition that the limitations period for a § 1983 claim depends on the nature of the underlying right being asserted."). Per *Abrams*, *Wilson* rejected the premise that the "nature" of the right—whether statutory or constitutional—determined the relevant analogue when borrowing a statute of limitations from state law. *Id.* In other words, given the existence of a gap in federal law, there is only one gap-filling analysis for all § 1983 claims. The Communication Act does not close that gap—the statute does not specify the statute of limitations for § 1983 claims asserting its rights—and therefore *Wilson* is required to fill the void. *Tomanio*, 446 U.S. at 483. Section 1658, as interpreted in *Donnelley*, ***does*** close the gap in federal statutory law: § 1983 claims asserting rights "made possible by" post-1990 enactments have a specified federal statute of limitations. As a result, *Wilson*'s gap-filling mechanism is not necessary.

District 201 argues that Hernandez failed to allege facts sufficient to find municipal liability under § 1983. The argument's merits need not be adjudicated: in response, Hernandez consented to dismissal of his claims without prejudice. Although District 201 requests dismissal with prejudice, Hernandez's claims are, at this preliminary stage, dismissed without prejudice and Hernandez is granted leave to further amend his Amended Complaint within 30 days.

The employee defendants point to two purported flaws in Hernandez's Amended Complaint. First, they argue that Hernandez failed to identify a permissible legal basis for his employment discrimination claim because the "counts" refer to national origin discrimination. The argument is without merit: as this Court has noted before, a motion to dismiss must target "claims," not "counts." "Complaints plead claims, which is to say grievances." *ACF 2006 Corp. v. Mark C. Ladendorf, Attorney at Law, P.C.*, 826 F.3d 976, 981 (7th Cir. 2016). "Counts," by contrast, typically describe different legal theories by which those facts purportedly give rise to liability and damages. *Lucas v. Vee Pak, Inc.*, 68 F.Supp.3d 870, 876-77 (N.D. Ill. 2014); *see generally NAACP v. Am. Family Mut. Ins. Co.,* 978 F.2d 287, 292 (7th Cir. 1992). Although plaintiffs are permitted to plead in counts, it is axiomatic that a plaintiff is not required to plead legal theories at all. *See Jajeh v. Cnty. of Cook*, 678 F.3d 560, 567 (7th Cir. 2012) (hostile work environment claim pleaded where complaint never used that term); *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) ("[W]e have stated repeatedly (and frequently) that a complaint need not plead legal theories, which can be learned during discovery.").

The proper question is whether the events described in Hernandez's complaint can plausibly be understood as race discrimination. The anti-Hispanic conduct alleged by Hernandez qualifies. *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 756 (7th Cir. 2006), as amended on denial of reh'g (May 25, 2006) ("[T]he majority of the Supreme Court has resolved much of this issue

by defining race broadly to include identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics."). The fact that the Amended Complaint's "Causes of Action" section labels the conduct as national origin discrimination is irrelevant. *See, e.g.*, *Cardenas v. Aramark Facility Servs., Inc.*, No. 05 C 6462, 2006 WL 1344057, at *2 (N.D. Ill. May 11, 2006) ("Count II will not be dismissed, but it will be understood to be based on racial discrimination.").

Second, the employee defendants argue that Hernandez has not pleaded facts showing that they "caused or participated" in his termination. For claims brought under § 1983, individual liability is appropriate where the "individual defendant caused or participated in a constitutional deprivation." *Hildebrandt v. Illinois Dep't of Natural Resources*, 347 F.3d 1014, 1039 (7th Cir.2003) (quoting *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir.1996)). Where an employee did not formally participate in the termination decision, however, the "cat's paw theory" can support individual liability "for a subordinate employee who intentionally causes a decision-maker to take adverse action against another employee." *Smith v. Bray*, 681 F.3d 888, 899 (7th Cir. 2012), overruled on other grounds by *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016).

Although the Seventh Circuit has not ruled on the availability of the cat's paw theory of liability under § 1983, it has, in dicta, speculated about, and even assumed, the theory's availability. *See, e.g.*, *id.* at 899 (finding that the cat's paw theory could "support individual liability under § 1981" and that "[i]n general, the same standards govern intentional discrimination claims under . . . § 1981, and § 1983."); *Redd v. Nolan*, 663 F.3d 287, 295 (7th Cir. 2011) (reasoning, in a § 1983 case, that the defendant "does not argue" the "'cat's paw,' and nothing in this record suggests any retaliatory motive trickled up to [ ] the decisionmaker"). As the Seventh Circuit noted in *Smith v. Bray*, persuasive precedent also supports this result: "at least five circuits

13

have indicated that a cat's paw theory would support imposing individual liability under § 1983." 681 F.3d at 898. Finally, in requiring that intentional action be the "proximate cause" of the ultimate termination, the cat's paw theory comports with the standard for individual liability under § 1983. *See id.* at 900. Considering all the above, the Court finds that the cat's paw theory can support individual liability under § 1983.

Under a cat's paw theory, Hernandez's complaint alleges sufficient facts, taken as true, to plausibly find that the employee defendants' actions caused the termination. As in *Smith*, the employee defendants were substantially involved in the process that resulted in Hernandez's termination. *See id.* at 900. Keating, Kuzniewski, and Zundell were all present for the initial investigatory meeting. According to the suspension letter, that meeting directly resulted in a Hobson's choice for Hernandez: resign or be suspended indefinitely without pay. The same letter stated that a recommendation of termination would be presented to the Board of Education—a recommendation that was adopted by the Board the day after it was delivered.[5] This sequence of events permits an inference that, in addition to being initial, the investigatory meeting conducted by the employee defendants was decisive. In sum, the discriminatory bias of Keating, Kuzniewski, and Zundell plausibly "tainted the Board's ultimate decision." *Oesterlin v. Cook Cty. Sheriff's Dep't*, No. 18-3228, 2019 WL 3249859, at *3 (7th Cir. July 19, 2019).

\* \* \*

---

[5] As the events are described by Hernandez, there was no obvious intervening or independently sufficient cause for his termination. *See Jajeh v. Cty. of Cook*, 678 F.3d 560, 572 (7th Cir. 2012) (finding, where there was an alternative justification for termination, that the discriminatory act "was not a proximate cause of [plaintiff's] termination"). Further, because Hernandez was not present at the Board's hearing, it is certainly plausible that the Board did not conduct a "meaningful and independent investigation"—a step that can break the "chain of causation." *See Schandelmeier-Bartels v. Chicago Park Dist.*, 634 F.3d 372, 383 (7th Cir. 2011).

District 201's motion to dismiss is granted without prejudice and Keating, Kuzniewski, and Zundell's motion to dismiss is denied. To properly bring his claims against District 201, Hernandez is granted leave to amend within 30 days.

Date: November 13, 2019

John J. Tharp, Jr.
United States District Judge